# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MELANIE HARPER, on behalf of**
**KAMANI KYLE, a minor,**

        **Plaintiff,**

    **v.**                                   **Case No. 05-C-0004**

**JO ANNE B. BARNHART, Commissioner**
**of the Social Security Administration,**

        **Defendant.**

---

## <u>DECISION AND ORDER</u>

    Plaintiff Melanie Harper ("plaintiff") brings this action on behalf of her 14 year old son, Kamani Kyle ("Kamani"), against defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("SSA"), seeking judicial review of the decision to terminate Kamani's supplemental security income ("SSI") benefits. <u>See</u> 42 U.S.C. §§ 405(g) & 1383(c)(3). In April 1989, when he was six months old, Kamani contracted spinal meningitis, which left him with severe residual deficits and profound left-side hearing loss. Kamani was subsequently awarded SSI on August 17, 1989.

    In 2000, the SSA determined that Kamani's condition had improved and cut off his benefits. Plaintiff appealed the decision, first to a Disability Hearing Officer ("DHO"), then an Administrative Law Judge ("ALJ"), but both found that Kamani's benefits were properly terminated. Plaintiff sought review by the Appeals Council, but the Council denied her request, making the ALJ's decision the final decision of the SSA for purposes of judicial review. <u>Boiles v. Barnhart</u>, 395 F.3d 421, 424-25 (7th Cir. 2005).

Plaintiff argues that the ALJ failed to properly evaluate her and Kamani's testimony, and ignored evidence pertaining to Kamani's inability to concentrate and complete tasks. The Commissioner responds that the ALJ's decision is supported by substantial evidence and free of harmful legal error. On review of the parties' briefs and the entire record, I conclude that the ALJ's decision must be reversed and the case remanded for further proceedings.

## I. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

The SSA has adopted a sequential three-step test to decide disability claims brought by children. See 20 C.F.R. § 416.924. Under this test, the SSA must determine:

1) whether the child is engaged in "substantial gainful activity";

2) if not, whether the child has a severe medically determinable impairment, i.e. one that causes more than minimal functional limitations;

3) if so, whether the child's impairment meets or medically equals the severity of a set of criteria for an impairment contained in the "Listings," or if it functionally equals the Listings. If it does not, the child is not disabled.

Id.

_____The "Listings" are a compilation of impairments the SSA considers presumptively disabling, without any further inquiry into the claimant's ability to function. See Keys v. Barnhart, 347 F.3d 990, 992 (7th Cir. 2003); Windus v. Barnhart, 345 F. Supp. 2d 928, 930 (E.D. Wis. 2004). In considering whether the child's impairment meets or equals a listed impairment, the evaluation is much the same as an adult's. Keys, 347 F.3d at 992 (citing 20 C.F.R. § 416.924(d)). However, if the child's impairment does not meet or equal a listed impairment, the SSA considers the question of "functional equivalence." This is done by evaluating the child's degree of limitation (i.e., extreme, marked, less than marked, or no limitation) in six "domains" – (1) acquiring and using information; (2) attending to and

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

> A claimant is to be found disabled if he has an "extreme" limitation in at least one of the domains, or "marked" limitations in at least two. 20 C.F.R. § 416.926a(d). "Marked" and "extreme" limitations in a given domain can be established by standardized test scores that are two or three standard deviations, respectively, below the mean--that is, either in the lowest 2.5 percent of the distribution or lowest 1 percent--provided, however, that the scores are representative of day-to-day functioning. 20 C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). Test scores are not conclusive, therefore, and the bulk of 20 C.F.R. § 416.926a is devoted to "general descriptions of each domain" against which a claimant's functioning may be compared; and so when the dust settles, the agency retains substantial discretion . . . .

Keys, 347 F.3d at 994.[1]

The regulations provide guidance in making the determination of functional equivalence. See 20 C.F.R. § 416.924a. In reaching a decision, the SSA must consider medical evidence, educational records, and information from others with knowledge of the child such as parents and care-givers. The SSA compares how the child-claimant's functioning compares to the functioning of other children his age who do not have impairments. In doing so, it evaluates:

(A) The range of activities the claimant does;

(B) His ability to do them independently, including any prompting he may need to begin, carry through, and complete his activities;

---

[1]This is the test under the "new, final" regulations, which took effect in 2001. The ALJ issued her decision in the present case on May 16, 2003, and considered the case under both the "new" and "interim" regulations in effect between1996 and 2001. The Seventh Circuit has noted that the differences between the "new" and "interim" regulations "are not great" and that the 2001 revision was largely to clarify and re-organize the earlier categories. Keys, 347 F.3d at 994. The parties do not point to any relevant differences. Therefore, I will review this case under the new, final regulations.

(C) The pace at which he does his activities;

(D) How much effort he needs to make to do his activities; and

(E) How long he is able to sustain his activities.

§ 416.924a(b)(5). The SSA also considers whether the claimant needs help from other people; special equipment, devices, or medications; or a structured or supportive setting, beyond what a child who does not have an impairment typically needs. Id.

**B.      Medical Improvement Standard/Cessation of Benefits**

After a claimant is found disabled, the SSA periodically evaluates his impairments to determine whether he is still eligible for disability benefits. See 20 C.F.R. §§ 404.1589 & 416.994a. The agency refers to this as a "continuing disability review." § 404.1589.

The review is comprised of three steps. First, the SSA considers whether there has been "medical improvement" in the claimant's impairment since the previous, favorable determination or decision.[2] § 404.994(a)(1); see also Johnson v. Apfel, 191 F.3d 770, 773 (7th Cir. 1999). If not, the SSA will, subject to a few exceptions, find the claimant is still disabled. Second, if there has been medical improvement, the SSA considers whether the impairment the claimant had at the time of the previous, favorable determination now meets or medically or functionally equals the severity of the listing it met or equaled at that time. If so, the SSA will find the claimant still disabled, unless an exception applies. Third, if the impairment no longer meets or equals the listing it previously met or equaled, the SSA considers whether the claimant's current impairment is disabling under § 416.924. § 404.994(a)(1); see also Sambula v. Barnhart, 285 F. Supp. 2d 815, 823-24 (S.D. Tex. 2002).

---

[2]This is referred to as the "comparison point decision" ("CPD").

**C.      Standard of Review of ALJ's Decision**

The scope of judicial review of an ALJ's decision is limited to determining whether the decision is supported by "substantial evidence" and based on the proper legal criteria. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. Id. Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. Young v. Sec'y of Health & Human Servs., 957 F.2d 386, 388-89 (7th Cir. 1992). Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. See Richardson, 402 U.S. at 399-400. A reviewing court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. Id. The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings. Brown v. Barnhart, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2003) (citing Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991)). The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996). Finally, while the ALJ need not discuss every piece of evidence in the record, she may

not ignore an entire line of evidence contrary to her findings. Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001).

## II. FACTS AND BACKGROUND

### A. Initial Application and Subsequent Disability Review

Plaintiff filed an application on behalf of Kamani on July 5, 1989, and on August 17, 1989 he was found disabled because of severe developmental delays, with his condition medically equaling Listing 112.05B, mental retardation. (Tr. at 106, 353.) In April 2000, the SSA began a disability review of Kamani's case (Tr. at 140), and on July 11, 2000, issued a determination that, although Kamani had profound hearing loss in one ear and a speech delay, his functioning had improved such that he was no longer disabled. (Tr. at 85, 118.)

### B. DHO Hearing and Decision

Plaintiff requested reconsideration on August 8, 2000 (Tr. at 90, 152), and the case was reviewed by a DHO on October 31, 2001 (Tr. at 93). Plaintiff and Kamani's aunt appeared before the DHO and testified that Kamani had trouble enunciating and ordering words in a sentence, which made him difficult to understand; he misunderstood what was said to him; he was far behind in school; and he could not be left home alone. (Tr. at 105-06.) Nevertheless, on November 6, 2001, the DHO issued a decision finding that there had been medical improvement in Kamani's condition in that he no longer exhibited the severe developmental delays present at the time of the CPD (Tr. at 109-10); and although Kamani still had severe impairments, they did not meet or equal the criteria described in any Listing, and he was not disabled under functional equivalence analysis (Tr. at 110-11).

**C.    ALJ Hearing**

Plaintiff requested a hearing before an Administrative Law Judge (Tr. at 116), and on February 21, 2003, she and Kamani appeared with counsel before ALJ Margaret O'Grady (Tr. at 42-44).

### 1.    Kamani's Testimony

Kamani testified that he was 14 years old (D.O.B.10/12/88) and in the eighth grade, enrolled in both regular and special education classes, the latter for reading, speech and math.  (Tr. at 49-50, 56-57, 59, 61, 67.)  He stated that he was doing "fine" in school and got mostly C's.  (Tr. at 50.)  However, he also testified that he had problems getting his homework done and had to stay after school or get help from a teacher or his parents.  (Tr. at 60-61.)  He said that he tried to do the hardest homework first, leaving the rest and asking for help the next day at school.  (Tr. at 60.)  He stated that he helped his mother clean up around the house, but sometimes had to be told a few times to do it.  (Tr. at 54, 64.)

### 2.    Plaintiff's Testimony

Plaintiff testified that Kamani was getting D's, C's and had one U on his report card. She stated that he had not repeated any grades, got along with his teachers and classmates, and attended a school for hearing impaired children.  (Tr. at 73-74.)

Plaintiff testified that Kamani was not involved in sports, but did go to church once or twice per week and to the boys and girls club every two months or so.  She stated that he was able to take care of his personal needs, e.g. dressing, bathing, brushing teeth.  After school he did his homework, helped clean the house and washed dishes with her help.  (Tr. at 74-75.)

Plaintiff stated that Kamani took no regular medication and did not receive psychiatric treatment.  (Tr. at 76-77.)  She stated that he was not able to hear out of one ear, even with

a hearing aide, but had hearing in the other and wore headphones in class in order to hear the teacher better.  (Tr. at 78.)  She said that at times he forgot and had to be reminded to wear the headphones, but he was doing better in the present school year.  (Tr. at 81.)

Plaintiff testified that she helped Kamani with his homework, and he also received help from a teacher two days per week after school.  (Tr. at 79.)  Nevertheless, she stated that he had trouble completing his assignments, did not understand things, and became frustrated after about 30 minutes.  (Tr. at 82.)  She stated that one of Kamani's teachers advised her that Kamani had similar problems in school, and another teacher gave him a "U" because he was not turning in his homework.  (Tr. at 83.)

Plaintiff stated that Kamani's speech was "coming along" though he still had trouble pronouncing some words.  The ALJ noted that she was able to understand Kamani, and plaintiff confirmed that she was usually able to understand him as well.  (Tr. at 80.)

## D.    Medical and Educational Records

### 1.    Medical Records

The transcript contains no pre-determination medical records.  The earliest records are from 1996 and 1997, when Kamani was seen at Sinai Samaritan Medical Center for swollen glands, fever, sore throat and ear ache.  (Tr. at 176-79, 183-85.)  On November 12, 1997, Kamani was seen at Sinai for a check up prior to his "M-team" evaluation.[3]  Kamani's teachers reported that he "zoned out" at times, and the doctor noted a history of seizures when Kamani was an infant, but none since the age of nine months.  Plaintiff stated that Kamani was in the third grade and did well academically, used headphones in class to magnify sound, and

---

[3]A "multi-disciplinary team" ("M-team") develops an "Individualized Educational Plan" ("IEP") for children with special needs.

Case 2:05-cv-00004-LA   Filed 07/14/05   Page 8 of 28   Document 22

received speech therapy.  (Tr. at 180.)  The doctor found Kamani to be alert and cooperative, though he was somewhat difficult to understand at times because he muttered.  (Tr. at 181.)

Prior to the hearing, plaintiff submitted additional medical records from Shorewood Family Physicians from 2001 to 2002 (Tr. at 339), which indicated that plaintiff twice requested a  referral for speech therapy for Kamani because she was not entirely satisfied with his school's efforts (Tr. at 340, 346).  Kamani was also treated for various minor ailments. (Tr. at 341-52.)

### 2.    Educational and Consultative Records and Reports

The transcript contains a great deal of evidence from Milwaukee Public Schools ("MPS"), as well as various reports and questionnaires completed for the SSA.

### a.    1997 MPS Reports

In an October 13, 1997, Speech/Language Hearing Report (when Kamani was age nine and in the 3rd grade), Speech Pathologist Alice Jo Star indicated that Kamani's academic functioning had consistently been below grade level, and that speech and language had been a concern.  (Tr. at 248.)  Star indicated that Kamani's progress toward IEP goals was slow and inconsistent.   (Tr. at 225, 249.)   During testing, Kamani's voice was characterized by disturbances in intensity, requiring the listener to request him to speak louder, and his speech was only 25% intelligible.  (Tr. at 225, 249.)  His hearing was unchanged from previous years, with normal hearing on the right and profound hearing loss on the left. (Tr. at 225, 249.) His memory and processing/reasoning skills were poor, and his scores on various tests were all in the 1st percentile.  (Tr. at 226, 250.)  Star concluded that Kamani had a significant delay in communication skills.  (Tr. at 227, 251.)  Staffing notes at the bottom of her report indicated that Kamani had a mid-low average IQ of 78, and that in the past "his IQ was more reflective of <u>average</u> potential."  (Tr. at 227, 251.)

In a November 4, 1997 report, school psychologist Karen Smith reported that Kamani placed in the mid-low average range of intelligence and appeared to be functioning at the late first grade level for language arts and the late second grade level for math skills. On the sensory-motor test, he ranked in the 50th percentile. (Tr. at 263.) In the socio-emotional area, Kamani was noted to have age-appropriate learning skills but tended to be easily distracted. (Tr. at 263.) Further testing from October 22, 1997 revealed basic reading skills in the 10th percentile, mathematics reasoning in the 21st percentile, and spelling in the 7th percentile. Visual-motor integration testing placed him in the 50th percentile. (Tr. at 261.)

On December 18, 1997, MPS diagnostic teacher Jean Kranendonk prepared an "Exceptional Education Report," stating that Kamani had a "delay in the acquisition of academic skills." (Tr. at 213, 253.) The report indicated that progress towards the goals of an earlier IEP was "satisfactory, but concerns are still evident." (Tr. at 213.) He was in regular class 50% of the time and received support from a DHH teacher the other 50%. (Tr. at 213.) Informal and formal evaluations revealed a 2.2 grade level in reading, 1.6 grade level in spelling, 2.0 grade level in written language, 3.4 grade level in math, and K.2 grade level in general information. (Tr. at 252.)

### b. 1998 IEP

On April 30, 1998, when Kamani was nine and a half and in the 3rd grade, the M-team concluded that he had exceptional educational needs and that an IEP was necessary.[4] (Tr. at 207, 209.) The M-team stated that Kamani's intellectual functioning was within the mid-low average range, that he was easily distracted, and some non-compliance was noted. He seemed to have age-appropriate skills, but there was some evidence of inconsistency in his

---

[4]As noted, there apparently was an earlier IEP but it is not contained in the record.

social and emotional functioning. The M-team found that Kamani was functioning at a beginning second grade level in reading, written language and spelling. His math skills were inconsistent but in the late second to early third grade level. Speech and language skills were significantly delayed, and his conversational speech was 25% intelligible to an unfamiliar listener. (Tr. at 209.)

In the IEP issued on August 26, 1998, the M-team concluded that Kamani would participate in regular classes 75% of the time and receive support from a DHH teacher the other 25%, particularly in reading and writing, and receive small group instruction in reading and math. (Tr. at 193.) He was also to receive speech therapy to improve his intelligibility. The IEP noted that Kamani's test scores were in the 1st percentile for language comprehension, a significant delay for a cognitive range of 80 IQ, and that his hearing loss could not account for all of the lags in vocabulary knowledge and verbal processing. (Tr. at 203.)

### c. 1999-2000 Report Card

Kamani's 1999-2000 (5th grade) report card indicated that he was below grade level in language arts, and was not meeting expectations in reading, listening and speaking, writing, social studies, mathematics (2 of 3 periods) and science (2 of 3 periods). He met expectations in health. (Tr. at 244.) He met IEP goals in the first period, but not the second and third. (Tr. at 245.) Kamani's teacher noted a lack of effort, and that he had more skills and potential than he had chosen to use. (Tr. at 245.) In March 2000, the teacher noted that Kamani seemed to have an "on/off" button: when he was "on" he was focused and learning, when he was "off" he was distracted and not learning much. (Tr. at 246.)

Case 2:05-cv-00004-LA    Filed 07/14/05    Page 11 of 28    Document 22

### d.    2000 SSA Reports

On May 1, 2000, after the continuing disability review had commenced, Kamani's teacher prepared a questionnaire for the SSA, indicating that his attention span/concentration was fair to poor and he needed constant reminders to keep on task. She further stated that he had poor independent work habits and was slow to transition between activities. His speech was not understandable, and he received speech therapy two times per week for 30 minutes. He had no physical impairments but some trouble cutting and drawing. She opined that his learning capacity seemed somewhat limited. (Tr. at 149, 150.)

In a May 3, 2000 questionnaire, Kamani's speech pathologist indicated that Kamani's voice was quiet and he required prompting to speak louder. She further indicated that his speech was hesitant, and he was unclear to unfamiliar listeners. She stated that he was able to functionally communicate but was not able to clearly expand logically relative to his peers. She further stated that he was slower to process and reason than his peers. (Tr. at 222-23.)

On June 27, 2000, Stan Brandriet, MA, CCC, evaluated Kamani at the behest of the SSA. (Tr. at 229.) Plaintiff admitted that Kamani had made substantial gains in the past few years but stated that he still had problems with intelligibility and following directions. (Tr. at 229.) On examination, Brandriet found Kamani 100% intelligible, as long as the rate of oral motor planning was controlled. Kamani often self-corrected and his imitation processes were excellent. (Tr. at 230.) His listening skills were quite good. On the Goldman-Fristoe Developmental Articulation Scale, Kamani scored in the 89th percentile. However, on the Revised Peabody Picture Vocabulary Test, he placed on the lower first percentile with peers. (Tr. at 231.) On the Expressive One-Word Picture Vocabulary Test, he ranked in the 42nd percentile. On the Test Of Language Development, Kamani's scores were in the ninth percentile, 16th percentile, lower fifth percentile, ninth percentile, lower fifth percentile, and

low second percentile in the six categories measured.  This data indicated that Kamani was functioning substantially below chronological age level expectations related to receptive and expressive skills.  Brandriet stated: "Academically, he would be at some disadvantage with his peers but socially he would be competitive with most of the young men of his chronological age level."  (Tr. at 232.)  Brandriet's impression was sustained left lateral severe hearing impairment, mild to moderate degree receptive vocabulary lag, and near-normal expressive skills.  (Tr. at 233.)  Brandiet concluded: "All current delays should definitely be viewed as transient and should not, in the future, with maturation and continued educational, remedial processes, ever represent any serious  long-term delay."  (Tr. at 233.)

On July 3 and 10, 2000, Mary Harkness, M.D. and Cathy Propper, Ph.D, completed a Childhood Disability Evaluation Form for the SSA, in which they concluded that Kamani had severe impairments (left side hearing loss and speech/language delay) but such impairments did not meet, medically equal or functionally equal a listing.  (Tr. at 264.)  They found less than marked impairment in cognitive/communicative function and concentration, persistence and pace, and no limitation in motor, social and personal functions.[5]  (Tr. at 266.)

e.    **2001 IEP**

In December 2000, MPS re-evaluated Kamani and produced a new IEP for January 25, 2001-January 24, 2002 (grade 6, age 11).  (Tr. at 292-99.)  Plaintiff advised that Kamani had made improvements in speech and language functioning since his 1998 IEP, though she still had concerns in this area.  Kamani was able to adequately express his needs and wants, but continued to have difficulty pronouncing some sounds.  Testing by the special education

---

[5]Under the interim regulations in effect at the time, there were five relevant areas of functioning: (1) cognitive/communicative, (2) motor, (3) social, (4) personal, and (5) concentration, persistence or pace.  The categories were re-named and a sixth added under the final regulations.

teacher indicated that Kamani's reading skills were at the 3.1 grade level, math skills at the 4.7 grade level, spelling skills at the 3.0 grade level, and factual knowledge at the 1.6 grade level.  His grade point average was 2.413.[6]  According to the speech pathologist, Kamani's speech was relatively intelligible, though he needed to pay closer attention to his pronunciation and articulation.  (Tr. at 272.)

A summary report from the school social worker indicated that Kamani was respectful and compliant at home and not disruptive at school.  However, Kamani did become frustrated when he was unable to figure out a task, and his response was to give up and quit. (Tr. at 273.)

On testing administered on January 16, 2001, Kamani's basic skills were at a 3.4 grade level, reading 3.1, writing 3.0, math 4.7 and factual knowledge 1.6.  The evaluation report noted that Kamani was integrated in all his classes and receiving passing grades.  He required additional time to complete some projects, but was working hard and putting in the time.  He had difficulty understanding instructions and needed things broken down into smaller steps to attain success.  (Tr. at 275.)

His annual audiological evaluation revealed normal right side hearing and severe hearing loss on the left.  It was recommended he continue using the FM head phone system in the classroom.  (Tr. at 277, 281.)  Based on his hearing loss, which affected his academic, language, speech and communication skills, MPS determined that he required continued special education services.  (Tr. at 278.)

In the goals and objectives section of the IEP, MPS wanted to improve Kamani's reading from a 3.1 to a 4.1 level (Tr. at 283), his written language skills from 3.0 to 4.0 (Tr. at

_____

[6]Later in the report his GPA was listed as 2.143.  (Tr. at 273.)

284), math skills from early 5th to 6th grade level (Tr. at 285), and for him to maintain a C average in all academic subjects in a mainstream class (Tr. at 286). Kamani was to attend regular classes, with a weekly speech and language special ed. class, use the FM system, and receive preferential seating, extended time to complete assignments, and monitoring of work completion. (Tr. at 287-88.)

### f. 2001 SSA Reports

In a January 26, 2001 SSA questionnaire, Kamani's hearing impaired teacher indicated that Kamani was easily distracted and often required redirection. The teacher stated that Kamani's reading and language skills were delayed by three years, and he required assistance doing his work and turning in assignments. The teacher added that Kamani's speech and language delays were typical of a hearing impaired student, and his academic skills in reading and language were delayed due to his hearing loss. (Tr. at 161.)

On September 5, 2001, Irene Ibler, M.D. and Michael Mandli, Ph.D, completed a childhood disability evaluation form for the SSA, in which they concluded that Kamani had severe impairments (left side hearing loss and mild to moderate receptive vocabulary lag) but that neither met, medical equaled or functionally equaled a listed impairment. (Tr. at 301-02.) They found that Kamani had marked limitation in acquiring and using information (based on various test scores), but no limitation in attending to and completing tasks, interacting and relating to others, moving and manipulating objects, caring for himself, and health and physical well-being. (Tr. at 303-04.)

An October 27, 2001 review by Carole Wilson, MA, CCC-SLP, stated that Kamani had "receptive language skills that are severe but less than marked in limitation." (Tr. at 307-307A.)

### g. 2002-03 IEP

In his 2002-2003 IEP, when Kamani was 13 and in the 7th grade, MPS noted that Kamani wanted to do well and enjoyed working in groups. (Tr. at 313, 314.) However, he was functioning only at a 2.7 grade level in reading comprehension and his writing and math skills were around the level of 4th grade, no better than the previous year. (Tr. at 314.) In the goal section of the IEP, MPS stated that Kamani should improve his reading from a 3rd to 4th grade level (Tr. at 315), demonstrate a one year gain in math skills from early 5th grade to a 6th grade level (Tr. at 316), demonstrate a one year gain in overall written language skills from 4th to 5th grade level (Tr. at 317), maintain a C average in all academic subjects in mainstream classes (Tr. at 318), and increase comprehension and use of spoken language to his ability level (Tr. at 319). These goals were virtually identical to those set forth in the previous year's IEP.

In the program summary, the IEP indicated that Kamani would received daily special education services in reading and math, two hours per week in science and social studies, one hour per week of speech and language special education, and work in small groups for larger writing projects in the special education classroom. (Tr. at 320.) He was also to use the FM system, receive preferential seating, extended time for projects and tests as needed, and curriculum modifications and one-on-one reinforcements as needed. (Tr. at 321.)

### h. 2002 Report Card

According to his November 2002 report card, Kamani received five C's, one D, and one U. (Tr. at 323.) Regarding his progress on the 2002-03 IEP goals, the report gave Kamani an E ("emerging") for reading and written language skills, and a P ("progressing") for math and maintaining a C average in all academic subjects. He received no As (for "achieved"). In the comments, his teacher indicated that Kamani was working hard and turning in most of his

work. (Tr. at 324.) However, he had not been consistently wearing his FM system. (Tr. at 325.)

####     i.     2003-04 IEP

Finally, the record contains Kamani's 2003-04 IEP (age 14, 8th grade). (Tr. at 355.) At that time, Kamani was functioning at about an early 4th grade level in reading, 5th grade in math, and 4th grade in English. He had difficulty comprehending directions even when he clearly heard them and required an adult to monitor him for understanding of information. He also had difficulty retaining information, required repetition of material, and needed extended time to complete assignments. (Tr. at 359.) Kamani's goals were to increase reading from early 3rd grade to late 3rd grade level (Tr. at 360),[7] increase math skills from late 5th grade to mid 6th grade level (Tr. at 361), and English from late 4th grade to mid 5th grade level (Tr. at 362). He was to receive reading instruction in a small group in the special education classroom. He also needed material presented at a slower pace and directions given more than once. (Tr. at 365.) He was to receive 47 minutes daily reading special education instruction in the special education classroom, three 47 minute class periods of special writing instruction in the regular classroom per week, 47 minutes daily special education in math in the regular classroom, and 47 minutes weekly special education in speech and language. (Tr. at 366.)

#### E.     ALJ's Decision

On May 16, 2003, the ALJ issued an unfavorable decision. Following the test applicable to cessation of benefits cases, she first determined that there had been medical improvement since the CDP of August 17, 1989. (Tr. at 22.) Second, she found that Kamani

---

[7]It is unclear why the goal section used 3rd grade as the base while his present level of functioning was listed as 4th grade.

no longer met the listing used in the CPD. (Tr. at 24.) Third, applying the test set forth in § 416.924, she determined that although Kamani was not engaged in SGA and had other, severe impairments (hearing disorder and speech delays), neither impairment met or equaled a listed impairment. (Tr. at 24.) Under the functional equivalence analysis, the ALJ found that Kamani had marked limitations in the domain of acquiring and using information; less than marked limitations in attending to and completing tasks, and caring for oneself; and no limitations in the areas of interaction and relations with others, moving and manipulating objects, and health and physical well-being. (Tr. at 24-25.) Therefore, the ALJ concluded that Kamani was not under a disability and that cessation of his benefits was proper. (Tr. at 26.)

Plaintiff asked the Appeals Council to review the ALJ's decision (Tr. at 14), but the Council denied her request on November 5, 2004 (Tr. at 3). This action followed.

### III. DISCUSSION

Plaintiff does not dispute that Kamani's condition improved such that it no longer meets Listing 112.05B, nor does she argue that he meets any other Listing. However, she contends that the ALJ erred in her functional equivalence analysis by failing to properly assess the credibility of her and Kamani's testimony, and in finding no marked impairment in the domain of attending to and completing tasks.[8] I address each contention in turn.

_____

[8]Plaintiff alleged in her main brief that the ALJ improperly failed to specify the Listing under which she reviewed the case. However, as the Commissioner states in her response brief, when the issue is functional equivalence, the ALJ evaluates the six domains rather than the criteria of a particular Listing. Plaintiff abandons this argument in her reply brief, and I need not discuss it further.

Case 2:05-cv-00004-LA   Filed 07/14/05   Page 18 of 28   Document 22

**A.     Credibility**

**1.     Legal Standard**

Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing.  Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong."  <u>Jens v. Barnhart</u>, 347 F.3d 209, 213 (7th Cir. 2003).  "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision."  <u>Herron v. Shalala</u>, 19 F.3d 329, 335 (7th Cir. 1994).  Further, the ALJ must comply with SSR 96-7p in evaluating credibility.  <u>Lopez v. Barnhart</u>, 336 F.3d 535, 539-40 (7th Cir. 2003); <u>Brindisi v. Barnhart</u>, 315 F.3d 783, 787 (7th Cir. 2003).

SSR 96-7p provides, in pertinent part:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p.

Under SSR 96-7p, the relevant considerations include:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

While SSR 96-7p does not require the ALJ to analyze and elaborate on each of the seven factors set forth when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004).

Finally,

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7p; see also Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002) ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.").

**2.     Application to Present Case**

In the present case, the ALJ evaluated plaintiff's and Kamani's credibility as follows:

> The testimony provided by claimant and claimant's mother was credible. However, the records do not support the testimony regarding the severity of the claimant's limitations.

(Tr. at 27, # 9.) SSR 96-7p forbids such conclusory statements. <u>See</u> SSR 96-7p ("It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"). Further, SSR 96-7p precludes the ALJ from disregarding a claimant's testimony about the severity of his condition solely because it is not supported by the "objective" evidence.

In <u>Brindisi v. Barnhart</u>, 315 F.3d 783 (7th Cir. 2003), the court reversed a virtually identical credibility finding. In that case, the ALJ's entire credibility evaluation read:

> In considering the claimant's functioning and the areas of development, the undersigned has considered the testimony of the claimant and his mother, and find it generally credible. However to the extent that the claimant's parents alleged total disability, the undersigned do not find them fully credible, as it is not supported by the objective medical evidence and other evidence of record (SSR 96-7p and 20 C.F.R. 416.929).

<u>Id.</u> at 787. The court held:

> This is precisely the kind of conclusory determination SSR 96-7p prohibits. Indeed, the apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the Brindisis' credibility as an initial matter in order to come to a decision on the merits. Specifically, the ALJ does not explain the weight given to the Brindisis' statements and does not support its determination with any evidence in the record. In short, the determination is lacking any explication that would allow this court to understand the weight given to the Brindisis' statements or the reasons for that consideration as required by SSR 96-7p.

<u>Id.</u> at 787-88. I reach the same conclusion in the present case.

The Commissioner responds that the ALJ did not specifically reject any portion of the testimony but reasonably determined that the evidence supported a finding of marked limitation only in the domain of acquiring and using information, and a less than marked limitation in attending to and completing tasks. She further contends that such findings were

supported by the evidence. However, this argument ignores the clear violations of SSR 96-7p and the fact that the testimony the ALJ improperly evaluated addressed Kamani's inability to timely complete tasks. (Tr. at 60, 61, 82, 83.) Further, as I will discuss in the next section, there was a great deal of documentary evidence pertaining to this domain that the ALJ did not address. The ALJ may have discussed Kamani's daily activities,[9] improvement in certain areas, and lack of ongoing medical treatment in the body of her decision, but that cannot excuse the errors discussed above. Therefore, the decision must be reversed and remanded for reconsideration of Kamani's and plaintiff's testimony.

**B.    Attending to and Completing Tasks**

**1.    Legal Standard**

In 20 C.F.R. § 416.926a(h), the SSA set forth the manner in which it analyzes the claimant's ability to attend to and complete tasks:

> In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.

> (1) General. (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

_____

[9]Courts have repeatedly held that a claimant's ability to engage in minimal daily activities does not mean he is not disabled. See, e.g., Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2004) (collecting cases); Samuel v. Barnhart, 295 F. Supp. 2d 926, 955 (E.D. Wis. 2003) (collecting cases). In the present case, the ALJ and the Commissioner note that Kamani could sustain attention to watch TV and play video games. First, the ability to engage in these sorts of activities cannot be considered substantial evidence of non-disability. See Mason, 325 F. Supp. 2d at 903-04. Second, as I will discuss in the next section, the ALJ failed to address evidence of Kamani's inability to concentrate in school, a better indicator of his impairment in the domain of attending to and completing tasks.

. . .

(2) Age group descriptors.

. . .

(iv) School-age children (age 6 to attainment of age 12). When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

(v) Adolescents (age 12 to attainment of age 18). In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

(3) Examples of limited functioning in attending and completing tasks. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. . . .

(i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

(ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

(iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h).

## 2. Application to the Present Case

As noted, the ALJ found that Kamani had a marked impairment in the area of acquiring and using information based on his receipt of special speech and language programming, his profound left side hearing loss, receptive communication delays, and below grade level academic functioning. (Tr. at 24 ¶ 6.) She then found:

> In the areas of attending and completing tasks and caring for yourself, the undersigned finds the claimant has limitations, but that the limitations are less than marked. The claimant needs extra processing time and one-on-one time with a teacher to help in the explanation of what he reads. He is able to write a five paragraph essay, but generally requires help in generating ideas and organizing them. He does not always ask for help and does not like to revise his work. He does not independently use his FM system and requires a teacher to monitor his use. He is slower in completing his work than his classmates and needs extended time on assignments and projects. The IEP evaluation reports since 1998 show that the claimant continues to progress. The claimant's speech and language therapist, Alice Jo Star, commented the claimant "still tries hard to keep up with his peers in group science, math, and language arts work, but he is slower to process and reason."

(Tr. at 25 ¶ 1.) The ALJ appeared to significantly rely on the fact that the state agency reviewers found that Kamani did not have a marked limitation in this domain. (Tr. at 25-26.)

Although the ALJ is not required to comment on every piece of evidence in the record, she must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002); see also Zurawski, 245 F.3d at 888 (stating that the ALJ cannot ignore a line of evidence contrary to her finding). In the present case, I cannot be certain the ALJ considered all of the important evidence concerning this domain.

The evidence from MPS, which directly addresses to his day-to-day abilities, is filled with references to Kamani's poor concentration, distractability, and inability to timely complete

tasks, most of which the ALJ did not discuss. For instance, in the 1997 Speech/Language Report, Star noted that Kamani "often appears to be in the room but disinterested" in learning and required "prod[ding] to respond." (Tr. at 225.) He had difficulty establishing and maintaining a topic for three to four turns, following topic shifts and changes in conversation. (Tr. at 250.) Star recommended that the teacher gain his attention before beginning verbal presentations. (Tr. at 227.) In the April report proceeding the 1998 IEP, the M-team noted that he was easily distracted. (Tr. at 209.) In his 1999-2000 report card, Kamani's teacher said he had an "on/off button," and "organization continue[d] to be a challenge for him." (Tr. at 246.) On January 25, 2000 Star, noted that Kamani needed prompting to "keep up the pace his peers set for completing work." (Tr. at 247.) In a May 1, 2000 questionnaire, Kamani's teacher stated that his attention span and concentration were fair to poor, he needed "constant reminders to be brought back in," he had "poor independent work habits," and his transitioning from one activity to another was "slow!" (Tr. at 149, emphasis in original.) In the 2001 IEP, the social worker noted that Kamani became frustrated and quit when he could not figure something out. (Tr. at 273.) In a January 26, 2001 questionnaire, Kamani's hearing impaired teacher noted that he was "easily distracted and require[d] redirection often during the day." (Tr. at 160.) In a November 2002 grade report, three teachers noted that Kamani had not submitted homework, another stated that he needed "to make better use" of time, and a still another stated that he "need[ed] better concentration." (Tr. at 323.) In the January 2003 IEP, the M-team noted that Kamani would have to complete homework each night to maintain good grades (Tr. at 357), nevertheless, his goal was to turn in homework 7 out of 10 times (Tr. at 363), in contrast to the goal set forth in the 2001 IEP of

turning in homework 80% of the time (Tr. at 286.)   The ALJ did not account for this evidence, which bore directly on Kamani's ability to attend to and complete tasks.[10]

Further, contrary to 20 C.F.R. § 416.924a(b)(5), the ALJ did not account for the significant accommodations Kamani required to complete the amount of work he did.  In the 2001 IEP, the M-team found that Kamani needed to work in small groups for standardized testing, and for other testing required extended time, items read aloud, use of a calculator, and practice parallel prompts.  (Tr. at 280.)  He was also to receive preferential seating, assistance in turning in assignments, and one-one-one tutoring.  (Tr. at 283).  In the 2002 IEP, the M-team noted that Kamani required similar assistance plus help keeping track of assignments.   (Tr. at 318.)   In the 2003 IEP, the M-team recommended further accommodations, including modified assignments, repeated directions, extra time for tests and assignments, fewer choices on multiple choice tests, use of a calculator for computations, use of graphic organizers, assistance in generating ideas for writing, adult monitoring, and assistance with school work during FAVE classes or after school when necessary.  (Tr. at 360-363.)

Finally, as discussed, the ALJ failed to fully account for Kamani's and plaintiff's testimony.  She briefly noted Kamani's testimony that he tackled his hardest homework first and that his father helped him, before turning to a discussion of his ADLs.  (Tr. at 25, ¶ 4.)

---

[10]In the body of her decision, the ALJ noted that in the 1998 IEP Kamani's effort in class was listed as variable according to mood, motivation and interest  (Tr. at 22, ¶ 7); he was described as easily distracted and engaged in off-task behaviors requiring extra attention to complete assignments  (Tr. at 23, ¶ 2); and at the time of the 2001 IEP, Kamani's teacher said he required assistance doing his work and turning in assignments, and that he was easily distracted  (Tr. at 24, ¶ 1).   However, she did not incorporate these observations into her conclusion.  Further, her statement that the "IEP evaluation reports since 1998 show that the claimant continues to progress" appears unfounded.  The later IEPs express optimism but Kamani's skill levels in specific areas barely budged.

She did not address Kamani's testimony that his teachers helped him, he sometimes skipped other classes to get help, and he did not complete his assignment in robotics. (Tr. at 61-62, 63.) Kamani also testified that his mother had to tell him several times to help around the house. (Tr. at 64.) The ALJ did not account for plaintiff's testimony aside from her statement that Kamani stayed after school twice per week to get help with homework and had received such assistance since 6th grade. (Tr. at 25, ¶ 5.) Plaintiff also testified that Kamani got frustrated with his homework and quit after about 30 minutes. (Tr. at 81-82.) Kamani's teacher reported to plaintiff that he became frustrated when others were goofing off and another told her that he was not completing his homework. (Tr. at 83.)

Thus, there was a considerable amount of evidence that ALJ did not account for in concluding that Kamani's limitation in this domain was less than marked. The Commissioner responds that although Kamani had some trouble staying on task, no doctor or educational professional rated his impairment as marked or extreme. Although Kamani's teachers did not use the words "marked" or "extreme," their comments about Kamani, properly considered by the ALJ, could support a greater level of impairment that she found. Further, it appears that the ALJ may have placed undue reliance on the opinions of the state agency reviewers. Important as those opinions may be, the key question under § 416.914a is how the child functions on a day-to-day basis, not at any given time. Moreover, the question of equivalence to a Listing is one reserved to the Commissioner; it is not a medical judgment to be made by a physician. See Hector v. Barnhart, 337 F. Supp. 2d 905, 915 (S.D. Tex. 2004) ("Ultimately, the question of equivalence is an issue reserved for the Commissioner."); see also SSR 96-5p.

The Commissioner also argues that there is no evidence that Kamani's difficulties with concentration were as marked and severe as his cognitive and speech deficits, for which he

continuously received special services. However, as discussed, the ALJ failed to mention the numerous accommodations Kamani received to help him complete tasks. The Commissioner states that Kamani could sustain attention for activities he enjoyed, like TV and video games, and received no medication or services for an attention disorder. The ability to concentrate on a television show or video game is a far cry from the ability needed to complete a robotics assignment or take a test. Finally, plaintiff makes no claim that Kamani suffers from attention deficit disorder or some other identifiable condition that could be medicated. Whatever the source, she contends that his limitation is more severe that the ALJ found.

For all of these reasons, the decision must reversed and remanded for re-evaluation of this domain.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), sentence four. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of July, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge